Before we get started, I'll advise the lawyers that this is our only case this morning, so we intend to grant the parties 10 minutes or so of extra time and the amicus 5 minutes. So, Mr. Ryan, no need to rush. Mr. Chief Justice, and may it please the Court, I appreciate the extra time, and I didn't rush up here to start before you invited me this time. In reviewing the Fifth Circuit's initial decision in what we call Fisher I, seven members of this Court reaffirmed that a clear precondition to the use of race as an admissions factor was the ability to satisfy what was called the demanding burden of strict scrutiny articulated in Grutter and Bakke. By establishing that she was considered for admission to UT under a system that discriminated against her on the basis of her race, Ms. Fisher placed upon UT the burden of proving by evidence of a record that its use of race was, first, in pursuit of a compelling constitutionally legitimate interest expressed with sufficient clarity and concreteness to allow a review in court to determine, first, that the use of race was a necessary last resort in pursuing the interest defined, taking into account reasonably available nonracial alternatives. JUSTICE GINSBURG Mr. Ryan, may I ask, if we didn't have the 10 percent plan, if that were out of this case, and all that were left were the Grutter-like plan, would you then recognize that you had no claim? JUSTICE GINSBURG Well, with respect, I would question the premise of the question because it's not a Grutter-like plan in its entirety. And I'm saying even in the AAPIA system, it's not a Grutter-like plan, it's not a plan of shaping a class by individualized one-to-one comparisons, it's not aimed at a critical mass, it's not a Grutter plan in that sense. But I think the other part of this is that's, of course, not the case before us. When you look at the satisfaction of a compelling interest, you look and ask, does my preexisting system satisfy that interest, do I have a need to do something else, and if I have a need to do something, is that something else? If need is put aside. CHIEF JUSTICE ROBERTS, JR.: Well, let's put it this way. We do not oppose the use of the various PAI factors that were in place before race was added. What's wrong with this plan, of course — JUSTICE SOTOMAYOR No, no, no, no. I know you're saying they didn't need to do it. I said put it aside and answer Justice Ginsburg's question. If they had to use race, how are they using it improperly? CHIEF JUSTICE ROBERTS, JR.: If you have to use race and you want to use the model that was created in Bakke and Grutter, you would need to build profiles of individuals that would allow you to judge them one against another in the context of the class and the educational experience you were trying to create. JUSTICE SOTOMAYOR My God, that sounds like it's using race more rather than less than this plan does. CHIEF JUSTICE ROBERTS, JR.: I'm sorry if it sounds that way. It is not. It simply says in a situation of a Bakke situation where you're looking at every aspect of an individual and you're trying to judge whether one or another of individuals for places, the last places, would most benefit the class, the class as a whole as a learning entity, then you can, as Bakke indicates, take account of the fact that they may have different backgrounds which would contribute different ideas. Those are whole person comparisons, that this is not this system, that this system doesn't do anything like Bakke. So it's very different even if you separate it from the necessity issue, which is, of course, a major issue in this case. But I'm assuming your question that they've shown that they needed to use race, there was no other way to do whatever they were trying to do, which isn't clear to me either. So you have both the question of whether they've defined a legitimate, compelling interest. You have the question of whether they've shown any necessity to use race. But even if I put those aside, whether this is the narrowly tailored vision that came out of Bakke is a very serious question. It isn't.  And I can't— JUSTICE SOTOMAYORE – So you still haven't answered why this is worse than Bakke? I mean— JUSTICE SOTOMAYORE – How is race given a plus? I thought that what they're looking for is leaders in diversity, not just of race, but of experiences generally. I'm sorry, but those factors were in the PAI before they added race. Leadership demonstrated awards and success out of school, overcoming obstacles like a single-parent family. Those were all part of the PAI before race was added. Race was just tacked on, as they said, as a factor of a factor of a factor. They've shifted position as to how it's used in the district court. It was sort of to minimize the factor of a factor of a factor. It's a minor plus. Don't worry about it. It's now become, well, it's a contextualized part of the PAS, which is part of the PAI, and we can discretionarily jack that up any way we want. But all those other factors that they claim— JUSTICE SOTOMAYORE – I think you've briefly admitted that this isn't in favor of any particular race, that white people in some situations can show leadership, as well as black or Hispanic or Asian or Native American. Any race could benefit from this plus factor. So how is this worse than FACI? JUSTICE BREYER – With respect, we did not concede that, and we would not concede it, because the other PAI factors might benefit anybody of any race. People's circumstances, their leadership, their community efforts, those are universal, and they can benefit any candidate. But they don't benefit from the race factor. The race factor was designed to benefit— JUSTICE GINSBURG – But in Grutter, in both Grutter and what Justice Powell said would be proper in Bakke, race was a factor. Race itself was a factor. That's why I'm finding it very hard to distinguish what the university is doing apart from the 10 percent plan. But let me ask you about the 10 percent plan itself, because it seems to me that that is so obviously driven by one thing only, and that thing is race. It is totally dependent upon having racially segregated neighborhoods, racially segregated schools, and it operates as a disincentive for a minority student to step out of that segregated community and attempt to get an integrated education. JUSTICE BREYER – Justice Ginsburg, let me respond to this with respect this way. The top 10 plan does not classify anybody by race. It addresses only standing within the Texas educational system. JUSTICE GINSBURG – But it can work only in the background. JUSTICE BREYER – When you say work, it works on a number of fronts. It creates geographic diversity. It looks all over Texas. It doesn't distinguish between high schools. It creates socioeconomic diversity. It does have an effect, a demonstrated effect, on race because a number of minorities of the type they care about are admitted under the top 10 program. But it's not based on race. It's based on the degree of effort you make relative to the other people with whom you're being educated. JUSTICE GINSBURG – It's created because of race. JUSTICE BREYER – I'm not in a position to tell you why it was created.  JUSTICE GINSBURG – Is there any doubt that it was created to increase the number of minority students? Was there any other reason for the 10 percent plan? JUSTICE BREYER – Well, I've given you other reasons, which are it's kind of a democratic recognition that you want to invite people from all over Texas, regardless of the school they went to. You're looking for those who are trying the hardest, who are doing the best, who excel in their environment. JUSTICE BREYER – Well, it was recreated in the wake of Hopwood. So I think that was the purpose. To define a neutral framework within which to satisfy the state's and the university's objectives. JUSTICE BREYER – And certainly one in the legislature might have looked at the predictable effect, but that purpose and effect are different. JUSTICE BREYER – Yes, it was created, and in part because certain schools do have minorities. The idea was, well, that would benefit those schools just as it would benefit a rural high school in a white community, which ordinarily would have very great difficulty placing its students in the University of Texas. JUSTICE KENNEDY – But you argue that the University of Texas' goals, announced goals, are insufficiently concrete. Can you give an example of what, in your view, would be a sufficiently concrete criteria, or set of criteria, to achieve diversity? JUSTICE BREYER – Well, and certainly the Solicitor General has attempted to do so by breaking down the abstract goals into concrete objectives. One goal that certainly Greta respects is, if you have studied your campus and you believe there's an inadequate exchange of views and the minorities feel so isolated they cannot properly bring to bear their perspective on the campus, you can look at measures of how successful are we in this kind of dialogue and try to investigate that and try to say, okay, is there a level – when do we reach a level of critical mass, which is the term in Grutter, where that exchange is vibrant and is taking place on our campus? That's one measure. JUSTICE KENNEDY – Well, but I don't understand. How do you do that? JUSTICE BREYER – It's not easy to do, and it's not our job to do it. I mean, we're not here to tell them how to do it, but if one wanted to endeavor to try to find this kind of concrete level, we're not saying quota, but we are saying you have to – you, the university, if you want to use this forbidden tool, this odious classification, you've got to find a way to do it. You've got to be able to explain what your concrete objective is. JUSTICE KENNEDY – Are there any critical mass studies you can refer to? JUSTICE BREYER – None that I know about. JUSTICE KENNEDY – Scientific studies of, you know, at what point you suddenly have enough of a mass? JUSTICE BREYER – No. JUSTICE KENNEDY – So what did the university base it on? JUSTICE BREYER – The university based it on two things. It was short of the demographics of the high school graduating class, which is measurable but not legitimate, and it claimed that it was basing it on this classroom small class study, which they had conducted previously, which indicated that minorities were not present to their satisfaction in a lot of small classes. That's – JUSTICE KENNEDY – Excuse me. To their satisfaction. I'm asking on what do they base their satisfaction? On what do they base 15 percent, 20 percent? JUSTICE BREYER – They premised it on good faith, and that was accepted in the Fifth Circuit on the first iteration of this case, and this Court said good faith does not suffice. JUSTICE SOTOMAYOR – I'm sorry. I thought that the study they did showed that in 1996, they had more participation in these smaller classes. I don't know if they're really small when they're somewhere between 8 and 25 people. That was a – but there were more of those classes in 1996 than in 2003 or 2002 when they were looking at that study. It would seem to me that that suggests that there's less what they took from it, that there's less exchange of ideas in a classroom rather than more, based on this race-neutral policy. JUSTICE BREYER – Well, I think you – JUSTICE SOTOMAYOR – What's wrong – since you have to infer these things, you can't use a quota. You're saying we can't use – they can't use demographics. So they use a study that shows there's less classes, there's less people in classes. They talk to administrators, faculty, and students. They're having racial incidents on campus where students of color are complaining that they feel isolated, that stereotyping is going on on campus. What more do they need? JUSTICE BREYER – Let me start with your first concern, which is this classroom study. The first thing I would observe about it, if I were in their position, and I'm not, is that the second study was done at a time when there were more minorities admitted than the first study, and they claimed it went backwards. So that might tell me right away that the problem, the necessity for using race could not be demonstrated for that because when you – JUSTICE BREYER – Yeah, because the necessity is not necessity you're talking about, as I read it. I mean, you use words like critical mass and so forth. It sounds like a cloud of sort of you don't know what they're talking about. But as I read further into it, it becomes quite specific. That is, 75 percent of the students are at this university because they were in the top 10 percent of their class. And it doesn't take long before students and faculty, in particular situations, know who is who. Twenty-five percent of the students in that class are admitted of they're good students, not in the top 10 percent, on the basis of leadership, activities, awards, work experience, community service, family's economic status, school status, family responsibilities, single parent home, languages other than English spoken at home, SAT score relative to school's average, and race occasionally, too. Okay? We're talking about that 25 percent. And it won't take long before students in a class see that in that 25 percent, which means you aren't just in the top 10 percent of your class, in that 25 percent, there's hardly anybody who's African American or Hispanic. And seven years of experience with that kind of thing led the faculty at meetings, administrators, and others, to say we should do more to see that that 25 percent has occasionally somebody who's a minority. Does anybody know what the faculty, what their program is? It isn't something like critical mass, et cetera. And if you have to say, it seems to me, why is that not a diversity-related judgment of what is necessary? So, Justice Breyer, let me answer that. First of all, one thing your question establishes quite clearly is if one assumes premises from evidence that doesn't exist, you can draw conclusions that are perhaps invalid. So let me go back to where you started. You say these people are admitted on the basis of the various PAI factors which you read. That's not how they're admitted. That PAI is only part of the admissions criteria, and it's not truly holistic because in the holistic systems, you look at the person as a whole. Here, you could have the most wonderful PAI and never come close to admission because they use the AI independently. So they're not admitted. Every school is like that. Every school in the country that's a college that I've ever experienced is a combination of grades, class position, and a lot of other things. So I'm talking about people who aren't admitted, 75 percent are, solely on the basis of class ranking. And then you assume that people could identify them one from another. I was going to ask that. Does anybody except the faculty know who this elite 25 percent is? No. And all of the 10 percent people identify themselves? No, they do not. They hang around in bunches. I'm one of the 10 percent. They don't. And, of course, the level of admission to the faculty at the university's subgroup in which they study, whether it's business or communication, it's all done by AAPI. They're all done equally. Can I come back to the issue of classroom diversity? Because that does seem to me to be something that could be measured. And maybe there's evidence in the record that measures it. I don't know. So that's what I want to ask you. But the university knows which students, even if assuming that the students don't know, the university knows which students were admitted because they were in the top 10 percent and which were not. And presumably they have a record of all of the classes and which students enrolled in which classes. And so it would seem to me to be possible to determine whether the students who were admitted under the 10 percent plan were less likely to choose to enroll in the classes in which minorities are underrepresented than the students who were admitted under holistic review. Now, maybe that's in the record. I haven't found it. Is there anything in the record to show that? The best of the record, because they didn't study that specifically. When they did the classroom study, they did not try to distinguish who was in the class. It was just a number count by classification, how many minorities of this kind, how many of that kind. They counted African-Americans. They counted Hispanic students. And they counted Asians in that study. But they counted them by race. I don't want to predomit this line of questioning because I think it's important. And we're well into the substantive issues. May I begin with almost a procedural point? Did you object to the university's request that this case be remanded to the district court? We did in the Fifth Circuit. In the Fifth Circuit. It does seem to me, as Justice Alito's question and, frankly, some of the other questions have indicated, that the litigants and, frankly, this court have been denied the advantage and the perspective that would be gained if there would be additional fact-finding under the instructions that Fisher sought to give. And we're just arguing the same case. It's as if nothing had happened. And the reason for that... It seems to me that Justice Alito's question indicates that this is the kind of thing that we should know but we don't know. Well, let me point out that the purpose of strict scrutiny is not just to adjudicate. It is to instruct the university that before you use the odious classification, before you employ race, you ought to know these things. If you're going to depend on them, you ought to study them and know them. So the failure to do that so there is no evidence is not just because they didn't put it in... But they weren't given the chance to add additional evidence in order to meet that standard. Well, they can't go back and recreate the past. They can't... They have put in all the evidence available to them about... But they could answer some of the questions like the ones Justice Alito added. And I think it's a very important point. They could, I mean... But they'd have to go back and study the conditions at the time they made the decision. And I think that the failure to do that kind of thing indicates that the retreat to race was reflexive, was done on the day Grutter came down. Not only that, also the failure to put it in. It was their burden to put it in, wasn't it? Yes, and they knew... And so we're going to say, oh, they failed to put it in, let's give them another chance. Well, procedurally... Let's do a do-over. Set it back down so they can now put in what they should have put in in order to prevail the first time around. And I entirely agree with that. And in fairness, they knew that the standard was strict scrutiny. Grutter had said strict scrutiny. Bakke said strict scrutiny. It was no surprise. And Justice Alito, more directly, the evidence we did find in the record indicated that where the most selective schools were concerned, which would then lead you to the smaller classes, more of the top ten minorities enrolled in that than the added minorities that they derived. But the issue in this case is not whether the university can have holistic review. Correct. The issue is whether they can have, as a component of holistic review, after they have taken into account other characteristics that are not dependent on race, they can add race as an additional characteristic. And so if it were... Would there be any way of determining, if there were a remand, which of the non-top ten admittees were admitted solely because of race? In other words, these students would not have been admitted taking into account leadership and family education and socioeconomic background and hardship and everything else. According to the University of Texas, the answer to that is no. They cannot make that determination because, in their view, race is contextual. You cannot sort out those who could have made it without race from those who didn't. And just in response to Justice Breyer, as a fact of record, prior to the indication of race, 15% of the non-top ten admits were the minorities who later benefited from race. So it was not devoid of admits who were Hispanic or African-American. It was producing 15%. And yet the marginal increase out of race was, if you try to measure it, very small. And I could think of reasons for that. So they couldn't put that in. They denied that you could ever identify those students, so that would be a fruitless pursuit, unless they completely changed everything they said before. Could you associate a number with the very small? I guess it would be the number of students who were admitted with the consideration of race who would not also... Correct. That would be the measurement. And there's no perfect answer to that when the universities say they can't identify them. But what we did was we looked at the historic period in which they were using the PAI without reference to race. We compared that to the percentage admitted of the total student body of those admits in the period when they were using race, and they compare. There's about a 2.5% difference, so it's very small. 2.5% difference in entering class numbers or number of minorities admitted? Number of minorities. You can measure it either way, by enrollment or admission. It's still going to be a very small number. It doesn't make... It's statistically lost. So it's a very small increment. And, of course, you... The number's important to me. Is it what any... I can ask your friend on the other side, but... It's under 3%. Of what? Of the number of... Of total admits and the total enrollees, both it's... And Judge Garza actually premised it... Of the minority students, of blacks. Yes, of the class itself. So what percentage of the... Yes, let me be very clear. What you're trying to measure is to what extent did the use of race boost over the use of the PAI on a nonracial basis? I'm sorry, I thought you said... In parents involved, we indicated that at some point the actual benefit of the program turns out to be not really worth the very difficult decision to allow race to be considered if, at the end of the day, it generates a certain number. And I'm trying to figure out what that number is. And I am saying that, as we said in our briefs, and we tried to... There's no perfect measurement because you don't have them running simultaneously. Right, right. But if you tried to do it by looking at the results when using the PAI but not race versus the results, both at the admission and enrollment stage of using the PAI affected by race, it's under 3%, and it's against... I'm sorry, I'm not sure where you get that number. As I looked at it between 2004 and 2006, seven, it nearly doubled from 3.6 of the holistic class to 6.8. For Hispanic students, that's for blacks. It went from 11.6 to 16.9. I don't think that's that small a change. In 2008, 20% of all black students and 15% of all Hispanic students were offered admission through holistic review. Black and Hispanic admission and enrollment rates have increased since 2005. This is on holistic review. The only exception was 2008, and that was because 92% of the class came in under the 10% plan. Well, you know, when you use numbers about admission on holistic review, that incorporates the ones who would have made it without race, so it's not a valid comparative number. The ones who would have made it without race are incorporated in, quote, holistic review, so those numbers really don't tell you anything about the effect of race. Wait a minute. I don't understand how that can be. If the 2004 number was that much lower than the 2007 number, race has to have some input in that. It has some effect. That's what UT says. They haven't measured, and they say they can't measure the effect. You're dealing with different classes. Could I ask you a different question now? I fear something. I know there is an educational debate on the benefits and costs of a 10% plan. I don't want to get into that debate, but I do have a worry, which is if you're reading proof of a compelling need or proof of a compelling need, will any holistic review ever survive? Because as I'm reading your answer, to narrowly tailor, schools have to use nonracial means of doing it, and if the 10% plan is the only thing that achieves a greater number in minorities, won't every school have to use a 10% plan? We're not certainly trying to dictate that every school use a 10% plan, nor is it the only way in which you can encourage and increase minority enrollment, so I don't accept that premise. Strict scrutiny is a heavy burden, and the purpose of strict scrutiny is to recognize that the basic... Your answer is yes. If there's no other way of doing it, then the only other race-neutral way, if offering scholarships, which this university did, increasing outreach to minority neighborhoods, they did and continue to do, there's a list of about six or eight other things they did that didn't increase the admission of minorities. There are many other things they could do. We're not trying to tell them how to run it. I mean, clearly, one of the things they could do is, even in the PAI, they recognize that by emphasizing, as they did at first, the two essay scores, which are strictly composition grammar, that is as culturally biased as you can get. It makes it difficult for those who've gone through an inferior secondary program to excel. So they cut that score to three. They could cut it to two. They could take measures which were aimed at looking at potential deficiencies in initial education, because you come from a home where there isn't a college-educated parent, and say, we're going to take those further into account because they apply equally without regard to race. So there are many things they could do within their system. Exactly the question, I think. I can put the same question out. Suppose we do send it back to the district court and put in more evidence. We tell them. Suppose we did that. And suppose they start with a basic plan where we want to use race as in the 25% of the holistic area. We want to do that. Now, there you've seen the chart, and I've seen the chart, of the factors that are 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12. You've seen that chart. I've seen the chart. And at the bottom of the chart, in my list, is the word race. It says race, R-A-C-E. Okay. What kind of evidence, in your opinion, could they or anyone else with any roughly similar plan put in that would show, in your view, that this is constitutional? Well, I mean, you have the example of Justice Powell's opinion in Bakke. And that says that if you're looking at the whole person and you're comparing individuals one to another to say who will best suit the educational needs of the class, then you take account of a person's race. It's part of the exercise. You don't isolate it, because if you look at Justice Bakke's example, he's got A and B, two minority African-American students, and C. And he says, depending on where the class stands in the overall composition of this learning entity, you might choose A under one circumstance. Vice versa, you might choose B. And sometimes you'll choose C without regard to race. So he's looking at it as a way of looking at the totality of a person, all of their achievements, academic and otherwise. So Bakke's systems are not at issue here, nor is the top ten at issue. That was accepted in this case. No one challenged it. So I'm saying you don't have to do the top ten. All right. So we have one. Justice Breyer, you can achieve this small increment of under 3 percent, in our view, by a number of alternatives that would give this same boost. These are the racially available neutral alternatives. I have one. What you're saying is you should look at the two folders, and as a kind of tiebreaker, use race. That's used okay. Now, you said there are several others. It would be helpful if you can summarize them in a sentence so I get an idea of what the others are. You could give more emphasis to the socioeconomic factors in the score. That's not to use race. I'm saying R-A-C-E, race. I want to know which are the things they could do that, in your view, would be okay, because I'm really trying to find out. Not fatal in fact, we've said. Okay? Not fatal in fact. Fine. What are the things, in your view, that they could do so it is not fatal in fact? And what I've said first is they could shape their system more toward the BACI system and move toward individualized consideration. That's one thing. That's not fatal in fact, because this Court endorsed the view that Justice Powell took of the Harvard system in BACI. So that's one. They could expand the top ten. That's another alternative. That's available. They could, as I said, they could rescore some of this. At the top ten, you said it doesn't use race. Justice Breyer is asking, you say, yes, race can be a factor. It was a factor in BACI. It was a factor in Grutter. And so far, you're saying now it can be a factor only if what? We're not talking about so-called neutral factors. We're talking about race. Well, I mean, the first question is, you know, why are you using it, but why? Therefore, it can be a factor. You have to clarify the objective. You have to show the necessity, and you have to show that if you, as they do, live with and accept over time a very small increment in a very small segment of the class, that you can't get it done any other way, because race is not the baseline. It's odious classification. That's where we differ. As I understand what you're saying, the BACI approach comparing two individuals and where they're tied giving a benefit to one race, that's okay, regardless of whether there are any other means of achieving the racial balance that you're looking for, right? Well, Justice Powell indicated in BACI that that approach could be used where it's part of a greater function form of the class. I understand. I understand. And the Court has apparently accepted we're not challenging it here. So you don't have to apply the question whether it could possibly be done in any other way. But you're saying anything beyond that, anything else, you have to establish first that it couldn't be done another way that doesn't take into account race, such as expanding the top 10 percent to the top 15 percent. That's correct. And it's not just me, Justice Scalia. That's what this Court said in the prior opinion. That's what I thought. It has to be shown to be necessary. And, of course, that's true of all strict scrutiny. And the Court said in the prior opinion that its other strict scrutiny opinions, such as that, were applicable here. This is not detached. It's not different. Strict scrutiny is a heavy burden. There's no question about it. That's why it's strict scrutiny. Is there any evidence that the holistic review being used by UT operates as a quota? You know, we have not claimed that. But since so much of it is masked and hidden, but certainly if you're motivated, as they said, by demographics, they want to get the number up. It's certainly number-driven. And if you look at one thing this Court said in Grutter, you have to have a basis to review this because you'd like to make it end. There has to be an end point. So if you can't find your objectives, you have no end point. But more important, you look at what are they looking at? What are they measuring each year? And they're measuring numbers. I want those numbers to go up. That's what they care about. That's what this system does. So whether it's a quota in the strict sense to where we have a definite target, their target may be equating with the population, the high school population. I mean, today they're a majority-minority campus in the real world. It's gone just because of the demographics. Ms. Warren, because your time is running out, there's one preliminary question I'd like you to address, and that is what is the relief you're seeking? I take it non-injunctive because Mr. Chair has graduated. Correct. And you have no class. So what specific relief are you seeking in this case? The case started with a plea for damages. The damages plea is live. It has never been found. But what do the damages consist of? They were the damages consisted of a refund of the unjustly committed fee for application. That was the direct one specified application. We also asked for other just and further relief because at that point of the case, we didn't know anything for certain to wit. If she was admitted, it would be one thing. If she weren't admitted, there would be other damages arising from her failure to be admitted. And we realized that was a separate issue. We reserved on it. If the university should say, okay, the application fee and whatever else we add to that, we offer that so that this contest will be over. If they offered you the damages that you are seeking, would the case become moot? No. And the reason is that the damages we are seeking were broader than that. That was the specific item of damage that was pleaded. They didn't challenge it under 12b-6. What is the broader? You gave me the application fee. Well, now Ms. Fisher has not been admitted, and then she has suffered the consequences of non-admission, which include she went to an alternative university, she had to travel as opposed to being in her home state. There's certainly good information that within the State of Texas, a degree from the University of Texas has consequences in earnings down the road, and that's measurable. And she doesn't have that benefit. All of those elements which were not part of the case originally because we were trying to enjoin in a way that would have her admitted, now she's not admitted. That changes the complexion of the case. That's why we bifurcated. That's why we reserved the right to amend within our broader plea for all adjusted relief. So in terms of just standing, we have an existing claim. They haven't paid us. They threatened to do that on the first petition for cert. They never did it. They didn't tender it. We have an existing claim. We have broader claims that are in co-ed because we haven't yet reached the stage of litigating remedy and damages. So the case continues. There's standing, and it's unquestioned standing in this case. Thank you, Your Honor. I suppose if they tender it, you don't have to accept it either, right? Correct. Thank you, Counsel. I'll reserve the rest of my time. Mr. Gower? Thank you, Mr. Chief Justice, and may it please the Court. To pick up on the questions this morning, I'd like to focus on three things. One, why the record supports the Texas legislature's conclusion in 2009 that the holistic plan at issue was a necessary complement to the State's top 10 percent law. Two, why the record shows that Texas's holistic policy has had a meaningful impact on diversity at the University of Texas. And three, why the record absolutely forecloses any claim that the University of Texas adopted a quota. With respect to the first question of necessity, there's three principal ways in which the record shows that the plan at issue was a necessary complement. First, as Justice Breyer mentioned, there's a significant portion of the admissions pool all out-of-state students, all students from Texas high schools that don't rank some of the best schools in the State, and all students just below the top 10 percent who are nevertheless great students who aren't eligible for admission under the top 10 percent at all. And the Fifth Circuit found that without the consideration of race in the mix for those students, admissions would approach an all-white enterprise. Secondly, the record in this case shows — Excuse me. Just the admissions of people beyond the top 10 percent. That's right. Which is an important component of the class you're on. Second, and I think this goes to your point, Justice Scalia — Well, on that point, can you determine which of the holistic admittees would not have been admitted if race was not added to the determination? Okay. This goes to the meaningful impact point, and I think there are several ways to address it, Justice Alito. First, what you can do is you can look in the increase in African-American and Hispanic holistic admissions after the consideration of race was added. And what you find is that in each year, 2005, 2006, 2007, the percentage of African-American and Hispanics admitted and enrolled under the holistic plan grew. In fact, there was a — Well, that's not really my question. My question was, if you look at an individual person, can you tell whether that person was admitted solely because of race, whether that person would not have been admitted were it Your Honor, I think given the contextualized and individualized nature of that inquiry, that's going to be difficult. But I think the record nevertheless answers your question, because you can show a marked increase in diversity under the plan at issue. I've just explained to you how the record confirms that holistic admissions of African-Americans and Hispanics increased markedly in each year. If you look at student body diversity overall, African-American enrollment increased by two — doubled from 2002 to 2008, from about 3 percent to about 6 percent. One of the things I find troubling about your argument is the suggestion that there is something deficient about the African-American students and the Hispanic students who are admitted under the top 10 percent plan. They're not dynamic. They're not readers. They're not change agents. And I don't know what the basis for that is. It's really based on a terrible stereotyping. What is the basis for that? It's exactly the opposite. This Court has said time and again that you can't assume that minorities think alike just because they have the same skin color. What the University of Texas does is it considers — it takes into account the fact that people who come from different experiences, different backgrounds, are going to have different contributions to the class. If you had the situation where all the out-of-state admits or most of the out-of-state admits were coming predominantly from Western states, then the University of Texas and any university would try to get out-of-state admits from other parts of the country because it would want the both from both perspectives. Maybe I've misapprehended either the question or the answer, but you're the one that says race can be relevant. And in answer to Justice Alito's question, you say, oh, that's stereotyping. It seems to me that you're — No, no. What's stereotyping, Your Honor, is saying that just because you get a sufficient number of blacks or Hispanics under the 10 percent plan means that you can't look at the class holistically and say we're not getting a variety of perspectives among African-Americans or Hispanics. Yeah, but what is the basis for saying that? That's what I don't understand. It's kind of the assumption if a student, if a black student or a Hispanic student is admitted as part of the top 10 percent plan, it has to be because that student didn't have to compete against very many whites and Asians in the high school class. It's a really pernicious stereotype. It's not a stereotype at all, Your Honor. It's based on the undeniable fact about the manner in which the top 10 percent plan operates. The top 10 percent law was enacted in response to Hopwood, and there's nothing — there's no challenge to the law in this case that admits many well-deserving students. But the fact is, is that the way that the top 10 percent law admits minority students is by admitting those students from the lower-performing racially identifiable schools. And the reason we know that is because if you look at the bill analysis decided by Justice Ginsburg in her dissent the last time we were here, that analysis specifically says on page four, because of the persistence of segregation in this state, minority students will be admitted under the top 10 percent plan. Well, I don't doubt that it does — that that is one of the things that it does. And I would have thought that that would be something that you would regard as beneficial. We've got the reason for adopting affirmative action in the first place, because there are people who have been severely disadvantaged through discrimination and lack of wealth, and they should be given a benefit in admission. And the university — So that's one of the things that it does. But it's not the only thing that it does. Your Honor, the University of Texas applauds those students. It wants those students. Those students are admitted through holistic review as well. Nevertheless, the university can look at an incoming class and determine that not all the perspectives among a particular class of students is being represented. This is straight out of the Harvard plan and Bachman. If you go back and — Well, this is a statistic that jumped out at me, which seems to me contrary to the stereotype on which the Fifth Circuit panel proceeds and on which you proceed. Of the African-American and Hispanic students who were admitted under the top 10 percent plan, 21 percent had parents who had either a bachelor's degree or a four-year degree. And for the holistic admittees, African-Americans and Hispanics, it's 26 percent. This is from a class of 2008. So there isn't — it seems to me it refutes the idea that all of these minority students who were admitted under — or most of them admitted under the 10 percent plan come just from these predominantly, overwhelmingly black and Hispanic schools with poor students. It just doesn't seem to be true. Your Honor, we've never claimed that all of them do. That's a straw man argument. But if you look at the data, what you would find, in particular look at the 2008 profile that we cited in the last brief on page 33, you do find that on balance there's a difference in backgrounds of the students, African-American and Hispanic students, coming in through the holistic plan versus the top 10 percent plan. And that's no surprise, given the obvious purpose of the top 10 percent plan. The purpose of the holistic review plan is to take into account all considerations. Can you say this? Let me read you two phrases from Fisher 1. The first phrase says this. The decision to pursue — and Fisher 1 obviously put together a court of people who don't agree necessarily on affirmative action generally. We agreed on those words. Words one, the decision to pursue the educational benefits that flow from student diversity is in substantial measure an academic judgment to which some, but not complete, judicial deference is proper. Okay? Now, words number two. The university must provide a, quote, reasoned, principled explanation for the academic decision to pursue diversity. Your plan is pursuing diversity among the 25 percent who are not admitted under the top 10 plan. Your principled, reasoned explanation for that academic decision is — Your Honor, it's set forth in the 2004 proposal, which is in the supplemental joint appendix. It's elaborated by the deposition testimony. Let me give you a few pieces of that. Number one is the university made clear it was pursuing the educational benefits of diversity in the broad sense specifically recognized by this court. This is on pages one through three of the supplemental joint appendix. Number two, the university made clear that in its judgment, the top 10 percent plan, in particular as it grew to crowd out the class, was compromising its educational objectives. That's on page 25A and 31A of the supplemental joint appendix. Number three, the university made clear that because of the decrease in student body diversity under the very race-neutral policies that our opponents are asking this court to impose, that additional measures were necessary to make sure that it was achieving its educational objectives. All of that is laid out in far more detail, frankly, than it was in Grutter or than it was in the Harvard plan. It's amplified by the deposition testimony. In particular, look at the testimony of Ms. Ishop and Mr. Walker. And I can elaborate on that if you would like. And you're talking about the 2004 plan? Yes, sir. One of the things that's said is that you would review the plan every five years. Has that happened? It absolutely has. In the record, Your Honor, it's established that we have reviewed it on an annual basis. We reviewed it on a five-year basis. I was personally involved in part of that. How did you measure whether or not the plan was working under the review that you undertook? Your Honor, we would look to a number of different things. What did you look to? And I'll answer that question. We'd look both to student body enrollment. We do look to classroom diversity. We look at feedback from students, from faculty. After all, this is an academic judgment, as this Court said in the Fisher case, and certainly it said in the Grutter and the Bakke case. We look to the racial climate, including incidents. There's briefs before you in the Black Students Association brief, Latino organization briefs. It's an academic judgment, but the facts are not an academic judgment. I mean, to say that, you know, if the faculty thinks we're doing great, we must be doing great. I mean, the facts are the facts. I don't think we give the faculty a leg up on what the facts are. And look at the facts, Your Honor. In 2002, you had 272 African-American enrollees out of a class of 8,000. Even Judge Garza recognized at Note 11 of his decision that the University of Texas had not achieved its critical master educational benefits in 2004. And so I don't think that that's seriously debatable. If it is, then we should have a remand and an opportunity to put in more evidence. Well, you're talking about the time. Grutter said that we did not expect these sorts of programs to be around in 25 years. That was 12 years ago. Are we going to hit the deadline? Is this going to be done, in your view, in 12 years? Your Honor, I'm not here to give you a date, but what I would say is this. There are systematic problems that these policies are attempting to address, including the test score gap between African-Americans and Hispanics. And the record in this case overwhelmingly shows that without the addition of race, student body diversity suffered particularly among African-Americans. I understand. I don't know whether that's a yes or a no. But it was important in the Grutter Court that these were a temporary, what is necessary, temporary expedience, because we're talking about giving you the extraordinary power to consider race in making important decisions. We don't do that as a matter of course. And so it was important in Grutter to say, look, this can't go on forever, 25 years. And when do you think your program will be done? Your Honor, as soon as we can achieve the same sufficient numbers for the educational benefits of diversity without taking race into account, we will no longer take race into account. The strict scrutiny inquiry focuses on whether or not there are race-neutral alternatives, which I think really is the way to police this. And in this case, because it's backward-looking, you look to whether or not the university policy is in place for seven years. This is a distinct case. You have a record of seven years of trying the race-neutral alternatives that they're proposing, top 10% plus race-blind holistic review, and the record tells you what happened. What percentage of the class is legacy? Is that a consideration for? The University of Texas is not the legacy, Your Honor. But if you look at what happened, and this is the second reason why it's necessary, I don't think it's debatable that student body diversity suffered at the University of Texas under the policies that they're asking this court to impose, and in particular under African-Americans, where you had evidence of glaring racial isolation. Certainly in the classroom, where 90% of the classes of the most common size, there was zero or one African-American. Well, on that subject, I don't know of any, you haven't mentioned in your briefs anything that the University of Texas has done to increase racial diversity at the classroom level, other than this admissions program. And I mentioned during your friend's argument a way in which you could determine whether the top 10 admittees are any more or less likely to enroll in classes, small classes, where there is a lack of racial diversity than the holistic admittees. And I don't see, and you haven't made any effort as far as I can tell to measure that. Let me answer that in two ways. One, doubling the enrollment of African-American students, which happened from 2002 to 2008, is going to increase diversity in the classroom. And we've looked at that, and it has. Secondly, with respect to diversity among particular majors, the University does take holistic consideration of which schools students are admitted to as well. So its policy addresses that concern as well. But what the record does show, Your Honor, conclusively I think, is that diversity languished at the University of Texas in the period where we had race-blind holistic admissions plus the top 10%, and that the planned issue here was necessary to supplement that. The Texas legislature found that. But I don't, you could have determined whether this is, whether the admission or the addition of race to the holistic equation has done anything to increase classroom diversity. It has. And you haven't done that. Your Honor, we've looked at that in the five-year analysis. As comparing, this goes back to your underlying claim that there's something deficient about the top 10 admittees. And maybe, if you have evidence that they are less likely to enroll in the classes where there's a lack of classroom diversity. There's a different breakdown there, Your Honor. But I think there's two dimensions to this diversity issue. One is just the glaring racial isolation that existed, particularly among African Americans. And then two is an effort through the addition of holistic review to admit minorities from different viewpoints, experiences, and perspectives. That gets back right to the core, the essence of the diversity embraced by this court in Bakke. If you look at the Harvard brief in the Bakke case, page 17, it specifically says our interest in the educational benefits of diversity would not be met if all of our minority students were coming from depressed socioeconomic backgrounds. Well, that's where I'm looking for evidence that that's true. And I would look at- What is it, have you looked at the top 10% admittees, for example, to see how many of them are leaders? Which is certainly a legitimate factor to look for students who are leaders. You say, well, there are just not very many leaders here. These are students who all they do is study. There's no evidence of that as far as I can tell. I don't think it's seriously debatable, but if we need evidence on this, let us put it into the record that a class selected by the holistic consideration of numerous factors is going to be more diverse in the way that promotes the university's educational interests than a class selected by a single factor. I'm sorry, that's not the question. It's whether students selected under the holistic process without giving extra points because of race. And there's two problems with that. One, minority students are not going to be selected. It's going to become, as the Fifth Circuit found, essentially an all-white enterprise. That's the first problem. And then the second- Wait, what are you telling me? The holistic process, if race is not expressly considered, will not result in any minority students? No. It's not zero, Your Honor. But take 2002, for example. 272 African-Americans out of a class of 8,000. That's glaring racial isolation. The University of Texas concluded that was unacceptable. And I don't think that that's seriously debatable. But again, if we need more evidence on why having 90 percent of our classrooms with the most common size with zero or one African-American doesn't achieve our educational objectives- What unique perspective does a minority student bring to a physics class? Your Honor- We're counting those among the classes in which there are no minority students. And I'm just wondering what the benefits of diversity are in that situation. Your Honor, we can talk about different classes. But this Court has accepted in Bakke and Grutter, and I think it accepted again in Fisher 1, that student body diversity is a compelling interest. Our friends do not ask this Court to overrule any aspect of Grutter or of Fisher or of Bakke. I'm not sure we said it's class by class. We said it's the case class by class. Your Honor, that's a caricature of the University's interest here. We made clear in the 2004 proposal and throughout- Caricature of the argument you're making. Student body- classroom diversity, Your Honor, if that's what you're focused on, was one aspect that the University looked to. The University is being hit by both sides here. Maybe that's fair because of the nature of strict scrutiny. But on the one hand, we're going to look to prove the way in which diversity was lacking in diversity. And then on the other hand, every time we point to something, our opponent sees it and says, aha, that's your objective. Our objective is the educational benefits of diversity in the very way that this Court has recognized for decades. Now the other way- I was going to ask, what evidence would you have put in if you had been successful in your motion to remand? And preliminary to that, I assume that the District Court would have had authority to remand to allow the summary judgment record to be expanded or reopened? Well, the Court of Appeals would have had authority in our view. The District Court- I mean, again, this case is here on summary judgment. I mean, the first question is whether there are viable issues of fact. But why did you want a remand? Because you wanted to expand the summary judgment record? And if so, what additional evidence would you have put in? Sure. If there are any shortcomings that this Court sees, certainly if you feel that there are deficiencies in looking on a more granular basis between the nature of the holistic admits that are admitted, the unique skills, qualities, talents that those admits bring as change agents and bridge builders, we can put that evidence in. We can put in additional evidence. But you asked for the remand. Yes. And my question was, what evidence did you propose to put in if your motion had been granted? Your Honor, we didn't- we specifically pointed to evidence on standing, and we talked about if the Court would like to supplement the evidence in other respects. And I think, frankly, we would be entitled to a remand. If you look at the Grutter case, for example, this Court rejected the argument that the percentage plan was an adequate substitute for the holistic consideration of race. It didn't require evidentiary findings on that. But if the Court thinks those findings are necessary, then the University of Texas can put in- certainly put in additional evidence in the record showing why these holistic students selected across the broad diversity recognized by Bakken contribute meaningfully to the class. In addition- I don't know what that proves. Sure. I'm sure that there are holistic admittees who are great students. They made a wonderful contribution to the university. I don't know whether you're going to be able to determine that they would not have been admitted if race hadn't been taken into account. They probably- they would have. Many of them would have been. Maybe all of them. But beyond that, what is to say that there are not comparable students who are among the top ten percent admittees? I bet there are. I think certainly you could conclude, Your Honor, that where you have all out-of-state students, all students from the best schools in Texas that don't rank, students who fall just below that ten percent but nevertheless are great students. If we're not getting adequate diversity out of that class, special class of students, we're not meeting our educational objectives. If you have doubts about whether or not the records- This is the fundamental problem that I think Justice Alito is pointing to, and you're sort of talking past each other. So maybe I'll explain his view. His range, isn't that? I could use the help. I think I'll explain what his view is. He seems to think that you didn't study the ten percent admittees enough. Just to see whether that group was diverse in and of itself. Whether you had enough people within that group that were change agents, that were not just poor people but people with college-educated parents, whatever other diverse view factors. I think he's saying, you didn't look to see if the ten percent plan did enough for you. And with deficits that plan created, that you should have filled in the holistic looking. So he thinks it's fatally flawed because of that. So that's his view, I think. So assuming that view, what's your answer? Let me answer. I know, he said it wasn't. First, we did look at that. We had seven years of experience under the race-blind holistic admissions policy. And what the university found, this is at page 31 and 25A of the supplemental joint appendix. That was with the ten, those seven years. Race-blind. Race-blind. Race-blind holistic. A certain number of them were with the ten percent. Absolutely. And what we found was that particularly as the top ten percent plan began to grow and crowd out more of the admissions pool, the university was not meeting its educational objectives. That's what it found specifically. It stated that on page 31A of the supplemental joint appendix. We also knew, it's interesting, the Texas legislature found that the holistic plan was a necessary complement. The Texas district court judge did. The Texas court of appeals judge and his colleague did. And with all of them recognized, is the obvious way in which the top ten percent plan operates with respect to the university. If you did not have the top ten percent plan, but you did have the program that you're advocating for here, the holistic review, would you have a better or worse chance of achieving the diversity you seek? Your Honor, I think the first thing I'd like to say is it's a different way. And I don't mean to dodge the question by that. But what I would say is if that's a meaningful difference, then this plan is in an even stronger light than the plan in Bakke and the Harvard plan. Because the University of Texas has heeded this court's message. It's taken three quarters of the class that it selects through a facially race neutral system, the top ten percent law. And what we're here debating is whether or not it can complement that policy by taking race into account for a quarter. Now, it may actually be that the university could achieve more diversity through the pure Grutter Bakke style plan. But we think, working with the Texas legislature, we've come up with a hybrid plan that works together to both address this court's concerns about using race too much in the process and address the University of Texas's legitimate core academic concerns about compiling a class that's diverse in all the ways that are appreciated by Bakke. If I could read one aspect of the deposition testimony here, this is from Ms. Iship on page 253A of the joint appendix. And she explains why top ten percent alone is not sufficient. What she says is, quote, considering an applicant on the basis of just their test score and class rank leaves out all of that life experience and circumstantial experience that an applicant faces that's also important, not only to how they develop and the type of student they are, but also to what they contribute to our campus. That's what the holistic policy adds. If you exclude race from that mix, you not only aren't looking at the individual in all its respects, and race still does matter in Austin and across this country, but you're preventing the university from rounding out its class, from complementing the single-minded way that the top ten percent law to achieve its diversity objectives in a way that is narrowly tailored to its interests, which this court has found compelling. Well, all of the colloquy so far indicates to me that if you had a remand, you would not have put in much different or much more evidence than we have in the record right now. Is that correct? No, it's not, Your Honor. I mean, look, we think that the record is sufficient. We think that the Fifth Circuit got it right. But to be clear, we can certainly put in plenty of additional evidence. I mean, there was a trial in Grutter, as Your Honor pointed out, in your decision in Fisher 1. There's been no trial here. There is, at a minimum, if our evidence doesn't cross the bar on strict scrutiny, at a minimum we put in triable issues of fact and whether or not the holistic plan was a necessary offset, whether or not the university was achieving its educational objectives in an environment in which you had 272 African-American students enrolled out of an incoming class of 8,000, an environment in which 90 percent of the classrooms had the most common side at zero. Why can't we make those inferences from the record? I mean, if you had a trial, you'd have credibility. You'd have experts and so forth. Well, I think that you can make those going in the university's favor. And one aspect of that, frankly, is the two-court rule that this Court usually applies, both the District Court and the Court of Appeals have looked at this and made findings. Well, you're saying we have a remand only if we lose. I mean, that's what you're saying. Well, I mean, I don't want to be result-oriented about this, Your Honor. But I do think that it's one thing to say in this record there are no triable facts where the courts below have gone that way. It's another thing to second-guess. And the Court can. It's a summary judgment issue. But it's another thing, I think, to overstep the conclusions of the District Court and the Court of Appeals here. And I think it's particularly relevant here when it comes to the operation of the top 10 percent law. Our friends have challenged the fact that the Fifth Circuit discussed the way in which it's operated, saying that that's outside the record. If it is, let us put all that evidence directly into the record. But they've never disputed the way in which the top 10 percent law operates. What I'd like to say, too, is if this Court rules that the University of Texas can't consider race, or if it rules that universities that consider race have to die a death of a thousand cuts for doing so, we know exactly what's going to happen. Experience tells us that. This happened at the University of Texas after the Hopwood case. Diversity plummeted, especially among African Americans. Diversity plummeted at selective institutions in California, Berkeley, and UCLA after Prop 209. And that is exactly what's taking place today at the University of Michigan. Now is not the time. And this is certainly not the case. There are those who contend that it does not benefit African Americans to get them into the University of Texas, where they do not do well, as opposed to having them go to a less advanced school, a slower-track school, where they do well. One of the briefs pointed out that most of the black scientists in this country don't come from schools like the University of Texas. They come from lesser schools where they do not feel that they're being pushed ahead in classes that are too fast for them. I'm just not impressed by the fact that the University of Texas may have fewer. Maybe it ought to have fewer. When you take more, the number of really competent blacks admitted to lesser schools turns out to be less. I don't think it stands to reason that it's a good thing for the University of Texas to admit as many blacks as possible. And this Court heard and rejected that argument with respect to Justice Scalia and the Grutter case, a case our opponents haven't asked this Court to overrule. If you look at the academic performance of holistic minority admits versus top 10% admits over time, they fare better. And frankly, I don't think the solution to the problems with student body diversity can be to set up a system in which not only are minorities going to separate schools, they're going to inferior schools. I think what experience shows that Texas, California, and Michigan is that now is not the time and this is not the case to roll back student body diversity in America. Thank you, Your Honors. Thank you, Counsel. General Verrilli. Mr. Chief Justice, and may it please the Court. I'd like to make a point about the compelling interest inquiry in light of what this Court said previously in Fisher. And then I'd like to make a point about the process aspect of the now tailoring inquiry in light of what this Court said in Fisher, which I believe, Justice Kennedy, will address your concerns about whether race is determinative here. And then I'd like to move on to what I think this case comes down to, which is whether the University has made a sufficient showing of need to consider race in its process. But before I make any of those points, Mr. Chief Justice, I can provide some specific detail in response to the question you asked earlier related to the parents involved point. Here are the numbers with respect to African-American students admitted through the holistic part of the program. In 2004, which was the last year before race was expressly considered, that number was 141 admitted through that number. And that was the high watermark, really, of the period of holistic review without race. This is in addition to the 10 percent. Correct. This is just the holistic numbers. That number then moves up to 176 the following year, to 220 the year after, and to 262 in 2007. So the number of holistic admissions almost doubles. And that results in... The problem, I guess, which is one issue that we haven't looked at, is how do you tell how many of those would have been admitted if their race were not considered? You're right that you can't tell for sure, but you do have a pretty good benchmark, I think, given that you have a number of years without considering race where 141 was the high watermark. Wait a minute. The next two years you recited, it was going up even when race was considered. So you could have said there's a fluctuation before then when race wasn't considered. That might have gone up. Well, before they started considering race, it went up and down, frankly, but 141 was the high watermark. There wasn't a consistent trajectory in those numbers. There's an aspect of the holistic review process done at the University of Texas, which may militate against the admission of African-American and Hispanic students for an ostensibly race-neutral reason, and that is that, as I understand it, standardized test scores count pretty heavily in that process. One of the things the university says it's looking for is students with high SAT scores who are not in the top 10% of their class, and there are many who think that SAT scores and ACT scores are culturally biased. So if you put less emphasis on that, you might not have the numbers that you just recited. It's kind of rather strange. We construct a process that may disadvantage African-American and Hispanic students for an ostensibly race-neutral reason, so then we have to add race in as a special factor to counteract that. I guess what I'd say about that, Your Honor, is that in Grutter, what the court specifically held was that the university is allowed to make those kinds of judgments in seeking to advance multiple objectives, to maintain an academic environment of excellence and to diversify the student body. I thought the record showed that the top 10 admittees have higher grade point average than the holistic African-American and Hispanic admittees. Well, the SAT scores are about the same. I'm not sure what the difference is. But, I mean, once they get to that, the SAT is supposed to predict how you're going to do in college. And I thought the record showed that the students who had lower SAT scores but did better as a measure by high school rank did better at the University of Texas. Isn't that the case? So I'm not sure what the answer to that is, Your Honor, but this all goes to the compelling interest inquiry, and let me focus on that. What the court said last time around is to satisfy the compelling interest inquiry, the university has got to articulate a reasoned, principled explanation for its decision to consider the educational benefits of diversity in a manner that this court has found to be constitutional and substantial. The University of Texas has met that standard. It has articulated exactly the same educational benefits of diversity at exactly the same level of specificity that this court held constituted a compelling interest in the Grutter case at page 330. It's exactly the same. And the principle argument that my friend, Mr. Ryan, makes challenging that is, well, actually, a lot of that is post hoc rationalization. In particular, the effort to find what you call qualitative diversity, diversity within diversity is all post hoc rationalization. That is simply not so. If you look at page one of the supplemental joint appendix, the first page of the is to create a diversity of perspectives among minority students. It says it again at page 28 of that proposal. The director of admissions declaration at page 43 of the joint appendix says it. It says it throughout. So there's no — there's just no argument that it's a post hoc rationalization. JUSTICE SCALIA. Mr. Verrilli, you think all of this won't be necessary in another 13 years if we stop disadvantaging some applicants because of their race? MR. VERRILLI. What I think about that is that the court, I think, made a prediction in Grutter that that would hopefully be the case. JUSTICE SCALIA. That's too short-term. What do you think, 30 years? MR.  I think the universities always — JUSTICE SCALIA. What is it about this program that is going to change things so that we can stop classifying people by race? MR. VERRILLI. I think universities do make progress on this, and I think you do get to a point where you create a virtuous cycle. And I think it does work, and I think that there's ample reason to believe that it does work. And I think the key point here, with respect to compelling interest, is that this really is, in terms of having the educational benefits of diversity, that's in the heartland of what the Court has said is the area in which the university's expertise and experience deserves deference. Now, if I could go to the process point with respect to — JUSTICE BREYER. Just before, you said — I agree with you, of course, that is what the Court said, the reasoned explanation. And it also said that this is a matter to which this Court will give some, but not complete, deference to what the university decides. What you're talking about is the need for the program. In addition to that — and this is what I'd like you to focus on, because there could be a question of whether to send it back for more evidence or not. So in looking through the records so far, on this specific point, I found an affidavit by a person named Walker, and that person named Walker described seven years of efforts to measure this stuff, described meetings of the faculties, described all kinds of discussions, described conclusions of the faculty members and the admissions officers and others that you did need. You did need affirmative action in the 25 percent of the holistic part. Now, given that that's there, and I found nothing to the contrary, is there a need for another — I mean, this is a loaded question, but I am curious. If you say yes, because, I mean, you know, there may be something that you should put in as well. You may think it would help to put something in. You may think it's not necessary, but just to be safe. What do you think? Is that affidavit the relevant one? Are there others? I believe that's the affidavit from the Director of Admissions, and it is highly relevant, and there is other information. And in the latter part of our brief, we documented it. We think — you know, our view, we argue for affirmance. We think it's sufficient. But if there's doubt, I do think the additional kind of information that might be developed in this case would be to look at the kinds of questions that the Chief Justice was actually asking about. How has the program worked in practice over the period of time in which it's been implemented? And I think that would be additional relevant information that might help make the judgment. If I could go to the process point, and then I will return to the need point. On process, what the Court said last time around in this case was that the Court had to ensure itself without deference that the process provided for individualized consideration and that race did not predominate. Again, the University of Texas's plan has every one of what the Court in Grutter at page 334 said were the hallmarks of a narrowly tailored plan. No quota, everybody competes against everybody else, no automatic award of points, modest factor. And in addition — and this goes to your question, Justice Kennedy, about whether there's an argument here that race is determinative — Texas is different from the University of Michigan's law school plan in every one of the four ways that Your Honor identified as being potentially troublesome in making race determinative. Unlike in Michigan, in Texas, the percentage of African American and Hispanics admitted does not mirror the percentage who applied. It's different. Unlike Texas, the number — excuse me, unlike Michigan, the number in Texas of admissions fluctuates year over year. It's not the same every year. Unlike in Michigan, the bulk of Hispanic and African American students admitted don't come from a small subset of the pool that's admitted after most are admitted based on race. And unlike in Michigan, the admissions officers don't monitor the process all the way along, which would, as Your Honor suggested, perhaps create the risk that race would become determinative in latter stage admissions. None of that is true here. So I think — None of this is true. How does the university know when it has achieved its objective? So at what point does it say, okay, the plan has worked? So I think — I'm trying to address process, and I'll go right now to need, which I think is — I really do think that you're right, Mr. Chief Justice. That's what the case comes down to. And I will answer your question directly, but I first want to make a point about how you shouldn't do it. And you shouldn't do it the way the petitioner has suggested you should do it. What the petitioner has said is that in order to assess need, the only way to meet the need portion of the strict scrutiny analysis is for the university to set a, quote, demographic goal. That's the petitioner's language. And then test whether or not they've made that goal. Okay. So how should they do it? And the reason, of course, that that's no good is that that's just a catch-22. No, no. I understand you disagree with their proposal. So here's how you should do it. And we've laid it out in our brief. We think that the approach — we think that approach is always going to be fatal in fact because if they don't — if they fail strict scrutiny — I know you don't agree with their approach. I promise you I'm going to answer it. I just think these points are important. And so with respect, we think our approach is faithful to Fisher because it's not always fatal in fact. What we say is that it's not a critical mass numerical kind of analysis. We say that what you do is you start with the university's articulation of the educational benefits it's trying to achieve. You require the university to state in concrete terms what success will look like. You then evaluate the evidence and analysis that the university relied on in order to make the judgment that it isn't where it needs to be and needs to consider race. We're trying to get it to work. So look at what they say they want and see if they don't. But how do you see it? And so you would look for concrete evidence — well-done classroom studies, well-designed surveys of student attitudes and faculty attitudes, graduation and retention rates. Are racial incidents going up or down on campus in frequency? There could be a whole list of them. But you would look at those. You would look at the university's analysis of those. And then you'd make a judgment whether the university has substantiated its case. And the burden, of course, is on the university. They've got to come in and convince you that they've substantiated their case, that they need to consider race. And they can do that with evidence that — of events that occurred after the suit was brought? Well, I think — I'm not quite sure how that works. Sure. I think that they can — as happened in Grutter, I think they have — the interests that they rely on have to be the interests that they contemporaneously identified when they adopted the program. I don't think there's an issue here on that. But I think the evidence can include evidence of how things are working in practice. For example, if they adopt a system and it does result in improvement, that does seem highly relevant and consistent with what the court held in Grutter was appropriate evidence. The reason I think it's a matter of concern is I heard from Mr. Gar where a lot of numbers. He said, look, this is why it's needed. And, you know, we will know we're doing better when the numbers look better. And I just wonder whether the idea of surveys — I looked at one of the surveys. I don't remember this record or the prior one. And I have to say, it was kind of sophomoric. I mean, do you feel that you've had enough interactions with — I mean, that was — this is consideration of race. It's a very serious matter. And to pass out some survey and see, I don't think is an adequate — It certainly wouldn't be adequate by itself. It might be probative evidence in combination with other probative evidence. But, you know, the question of classroom composition is hard evidence. And at some level, demographics are hard evidence too. Mr. Chief Justice, when you're talking about the African-American population at the University of Texas at Austin, you're talking about a population of 300 or 400 kids in a class of 6,000. I think the idea that there's a material risk of racial isolation in that situation is quite strong. The idea that there's a material chance that lots and lots of students are going to — 600 is going to make the difference? 600? I wouldn't feel isolated with 600. It might well make a significant difference. And if I could, in the time I have remaining, I'd like to just try to refocus the Court on the importance of what's at stake here. As we told you in our brief, our military leaders believe that it is imperative that we have officer corps that are not only diverse but capable of leading a diverse military, not only for effectiveness but for the very legitimacy of sending our troops into harm's way. Well, do you think that the African-American and Hispanic students who were admitted under the top 10 percent plan make inferior officers when compared to those who were admitted under holistic review? No, I don't. Not at all. Do you think that the ROTC graduates from the University of Texas make superior officers to those who graduate from, let's say, Texas A&M or Texas Tech? Here's what I think about that, Justice Alito. I think that we want to make sure, and this military example is only one of the important interests here, but with respect to that, we want to make sure not just that there are strong African-American and Hispanic candidates in that ROTC program but that everybody who graduates from the ROTC program at the University of Texas, white, black, Asian, Hispanic, everybody, knows how to lead effectively in a diverse environment in which they're going to be leading diverse troops. That's the interest. Now, that's certainly important, but to come back to my first question, is there anything to suggest that the top 10 percent students are less likely to enroll in ROTC, or when they do, they're not as good as the holistic admittees? No. I think with respect to the University of Texas in particular, but I'm also, you know, what the Court's going to say in this case obviously is going to apply to potentially every university in the country, and this is an important interest for the United States generally, that when you think about what's at stake here, that the interest in ensuring that we have military officers who can lead a diverse military force is critical. The interest in having law enforcement officers who are not just diverse but who can operate effectively with every racial and ethnic community in highly charged situations is critically important. Corporate America has told you that having a workforce that is able to function effectively in diverse situations is critical, and what I would just say in conclusion is that these are the considered judgments of people who actually have the responsibility to ensure that the vital functions of the government protecting the country with the military and with law enforcement, and the vital functions of commerce, these are the people who actually have to make sure that those functions are carried out, and this is their considered judgment, and I submit it's worth considerable weight in your analysis. Thank you. If I can, I'm sorry. That's all right. No, I'm glad you said that, and this question will sound very nitpicky and detailed and compared to what you were talking about, but I agree. I notice that the briefs in this case are like the briefs in Bruder, and to me that  by a thousand cuts. We promised in Fisher I that we wouldn't. That opinion by seven people reflected no one's views perfectly, but that's what it says, not fatal in fact. Okay? That's what I'm focusing on. It seems to me there are two parts to that, whether we have to send it back for another hearing or not. Part one you've dealt with, that's is there a need, a matter which Fisher I says we will give some but not complete deference to the university, and as you say, we have you went through that. There is a second part which I want you to address. The second part in Fisher we said there is no deference due to the university. On this part, it's called narrow tailoring. You heard your friend on the other side admit, he said, admit, maybe he believes it firmly. Why use the word admit? He said that in the plans of Bruder and the plans of Faki, those were okay in respect to narrow tailoring because they did compare the students one after another and used race as a plus factor. Now, what is there in this record that will support the view that what Texas has done in respect to narrow tailoring is no worse than, perhaps even better than, what happened in Bruder or Faki? So I would point Your Honor specifically to the declaration in pages 483a and 484a of the joint appendix of the admissions director in which he explains the way race is considered in the University of Texas system, and that explanation says expressly at page 483 that race is considered in exactly the same manner and given exactly the same consideration as every other special circumstances factor that the university considers as part of its holistic review. So that, I think that shows you that actually you know more about the way this program works than you did about the program that you affirmed in Bruder, and you have assurance based on that, and nothing in the record contradicts it that that's the way it operates. Thank you. Thank you, General. Five minutes, Mr. Ryan. Thank you, Chief Justice. Let me first indicate that one of the questions that's been asked repeatedly is, well, what impact did the use of race actually have? Judge Garza, and this is at Appendix 200, tried to make an estimate, because you can only make an estimate because UT didn't know, and they don't know now. His estimate was that a very small number, and it's in his opinion, it's not only by percentage, but it's by number, and that number is insignificant relative. Do you think that change has to happen overnight? Can I hear what you were about to say? What are those numbers? I'm really curious to hear those numbers. He assumed at the outside that any of the admits that were actually African American or Hispanic outside the top ten, he said, let me take that assumption and see what it would add. And he said it would constitute less than 1 percent and 2.5 percent respectively of the entire 6,322-person case. Can you tell me where you're reading from? This is Appendix 250 to 251A. It is Judge Garza's original dissent, and he repeated essentially the same point. But he calculated and he made different assumptions depending on how many of the admissions in the holistic program one would assume would be different because of race, because no one knows, and that's part of this. And clearly one, and I can read you these numbers, but you can read them yourself, it's a very small number. And his most realistic estimate was that it would yield only 15 African Americans and 40 Hispanic students in a class of 6,000. So we're talking about a very small effect even with assumptions that actually exist. One point is it's small. The second point, equally important, is no one knew because they didn't study it. And then we get the same point on this complementary, which was the big theme of the Fifth Circuit. Oh, it's a necessary complement. What does that mean? One sense, you've got to have some plan if you're going to cap the top 10 at 75 percent, so it's necessary to do something. But that doesn't make it a necessary complement. When you really look at what the Fifth Circuit said, they said it's based on two assumptions. One, the top 10 are drawn from these minority high schools. Where do they come up with that? They never studied the pattern of the top 10 admits. How do you know that a Hispanic or an African American student can't be in the top 10 at what they call an integrated high-performing high school? That's a stereotypical assumption. Sotomayor What you're saying basically is, is this is what the Fifth Circuit concluded, in which the school basically agrees, okay? If you don't consider race, the holistic percentage, whatever it is, is going to be virtually all white. And why? And you're saying no. And that is an assumption that has no basis in this record. It's a stereotypical racist assumption. No, it's not. That's what it is. It's not, because the reality that Justice Scalia wants to rely on. Let me finish my point. He's right. For their educational needs, there are competing criteria. They need to keep a certain SAT or whatever that's called, AI index, that has to be high because of the quality they want to keep the school at. That does discriminate against blacks on some levels because the difference in numbers are high. So if you have something like this, what you're saying basically is, and what he's proposing is, change your educational needs across the board and focus in only on race. And make sure that your school is black, Hispanic, or whatever, on numbers that are going to reduce its educational quality. That's basically what you're arguing, isn't it? No. And to be fair, I mean, the first thing I was just pointing out is that to get to the conclusion of the Fifth Circuit, you have to first assume the pattern of admits in the top ten, where they come from, which was never established in the record, never studied. And the second is that you have to assume that those coming from, all students coming from these integrated high-performing high schools don't include in their top ten percent any minority. Why? What we know is the school doesn't have enough. No matter what it does, it doesn't have enough numbers of black people. That comes back to the fundamental point. If we're just talking numbers, then you have to show the compelling need for more numbers. So that one of the reasons for defining your compelling need is that you have to then look at necessity in terms of the need. So in Grutter, what they said was, we have insufficient numbers of minorities to provoke the appropriate dialogue. When we look at the class as a whole, we think we can do better if we introduce different points of view. It's very individualized. It's a small class. So you can then say, increasing numbers, which they were certainly after, from three to 14, will meet that compelling need. Since they never bothered to define the needs, it's really hard to say what they were after and why numbers would or would not satisfy and whether the numbers they were generating, which included 15 percent of the so-called holistic admit, so it wasn't all white enterprise, why that wouldn't work. The key point is, you have to come to the court with the record. You can't make it up later, because that would say, do what you want, and when time comes, make it up. That's no way to litigate. And in this case, they said, we're ready for summary judgment. We've put in everything we need. If you look at their specific proffers, and the court of appeals, they said they wanted to take discovery, and even Judge Higginbotham, their best friend, said, from who? What does Ms. Fisher know about this? What are you going to take discovery about? And he found no need. In this court, all they say is, we'd like to reiterate the benefits of diversity, but those were accepted. And we'd like a few testimonials about students admitted holistically without knowing whether they were the beneficiaries of race or not. You can't litigate that way. Thank you, Your Honor. Thank you, counsel. The case is submitted.